501 So.2d 1113 (1987)
Jerry BRUNER
v.
UNIVERSITY OF SOUTHERN MISSISSIPPI, Jim Carmody, Roland Dale, Dr. Aubrey Lucas, and the Board of Trustees of Institutions of Higher Learning of the State of Mississippi.
No. 56210.
Supreme Court of Mississippi.
January 28, 1987.
Dale Hubbard, Wayne E. Ferrell, Jr., Ferrell & Hubbard, Craig E. Brasfield, Collins & Brasfield, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Ed Davis Noble, Jr., Asst. Atty. Gen., and John T. Kitchens, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before WALKER, C.J., and DAN M. LEE and GRIFFIN, JJ.
GRIFFIN, Justice, for the court:
This case, involving the alleged grant of an employment contract by an agent of a public board, comes to the Court from the Circuit Court of the First Judicial District of Hinds County, Mississippi. At trial, the judge granted directed verdicts as to the Board of Trustees of State Institutions of Higher Learning, the University of Southern Mississippi, Dr. Aubrey Lucas, the University's president, and Roland Dale, the University's athletic director. The jury then returned a verdict in favor of the sole remaining defendant, Jim Carmody, the University's head football coach. Here, Jerry Bruner, the plaintiff, appeals the directed verdicts as well as the lower court's *1114 denial of his motion for judgment notwithstanding the verdict. We affirm.
This case concerns a colossal misunderstanding between Jerry Bruner, an unemployed assistant coach, who, languishing in the brown waste of West Texas, viewed Hattiesburg, centrally located between his home in Florida and that of his wife in Louisiana, as a veritable Garden of Eden, and Jim Carmody, then recently appointed head football coach of the Golden Eagles, who was searching for a new offensive line coach.
According to Bruner, on February 2, 1982, Carmody called to offer him a job, stating, "So far as I'm concerned, you are the offensive line coach and I will not be looking for another coach, and I expect the same from you." This is consistent with Cathy Bruner's recollection of the conversation, which she overheard on an extension. On February 7, the parties repeated the essential points of this telephone call in a second conversation. Thereafter, Bruner withdrew his name from consideration for other coaching positions.
On February 15, Bruner flew from his home in El Paso, to Hattiesburg, meeting with Carmody over dinner and, thereafter, in his office. The following day, Bruner met Dale, who stated that he was glad Bruner was "coming over." Later, Bruner received the keys to an automobile, listing the University as his employer on the insurance application. He then contacted a local realtor, for whom Mrs. Carmody had worked, spending three hours looking at houses. Carmody also gave Bruner keys to an administrative office.
In the afternoon, Bruner met with Lucas. Their conversation, consisting of small talk about past work experience and mutual acquaintances, lasted approximately twenty minutes, followed by a two-minute conversation between Dale and Lucas, while Bruner waited outside.
On February 17, Dale told Bruner that he was not to appear on the practice field before the Board of Trustees approved Carmody's recommendation; otherwise, reporters would have the story prior to an official announcement. According to Bruner, this was the first mention of any requirement concerning the Board's approval of his appointment. Consequently, he spent the remainder of the day watching game films.
The next day, February 18, Dale told Bruner that he could fly to El Paso for the weekend, returning after the next Board meeting. Leaving his luggage in the trunk of the automobile, Bruner returned home.
Meanwhile, Cathy Bruner, Jerry's wife, had quit her job. On February 17, she received two estimates for the cost of the move, as required by the University. She also received a letter from the realtor, concerning available houses and their neighborhood schools. The children then notified their respective schools about the transfer of transcripts.
On February 23, 1982, the following Monday, Bruner received a call from Dale, informing him that he did not have the job. Dale offered no explanation. The next day, after several unsuccessful attempts to contact Carmody, the head football coach called Bruner to apologize, telling him that Lucas had not liked his appearance during their meeting. For the next five weeks, Bruner searched for another job, finally accepting one as an assistant coach in the Canadian Football League.
Yet, according to Carmody and Dale, called adversely, Bruner was merely one of several individuals considered for the position of offensive line coach. In fact, during their telephone conversations, Carmody only asked Bruner to come for an interview. Upon his arrival, though, Carmody agreed to recommend Bruner for the job, but stated that it was subject to the Board's approval. When asked then about Bruner's receipt of a car and keys to an office, as well as his access to game films, Carmody stated that this was consistent with interviews for other candidates.
Additionally, Dale testified that he told Bruner about other candidates interviewing for the job. Nevertheless, Bruner expressed extreme confidence in his ultimate selection. Moreover, neither Carmody nor *1115 Dale possessed any knowledge, relating to Bruner's purchase of automobile insurance.
Finally, Lucas stated that he had received a recommendation from Carmody and Dale for Bruner, but that based at least partially upon Bruner's appearance, he asked Dale to "look further." Lucas denied, however, that he had rejected their recommendation. The Minutes of the Board of Trustees of Institutions of Higher Learning make no mention of any recommendation for or approval of Bruner.

I.
Bruner appeals the grant of a directed verdict as to the University, arguing that Carmody, its agent, possessed the "apparent authority" to extend an employment contract for the position of assistant coach. The directed verdict then improperly removed the University from the suit, despite its liability as Carmody's principal. This, however, simply will not wash.
The University of Southern Mississippi is an agency of the State of Mississippi, Coleman v. Whipple, 191 Miss. 287, 298, 2 So.2d 566, 567 (1941), controlled by a legislative grant of authority to the Board of Trustees of State Institutions of Higher Learning. Miss. Code Ann. §§ 37-101-1 to -261 (1972). See also, Miss. Code Ann. § 37-119-3 (1972). Specifically, Miss. Code Ann. § 37-101-15(f) reads, in part:
(f) The board shall have the power and authority to elect the heads of the various institutions of higher learning and to contract with all deans, professors, and other members of the teaching staff, and all administrative employees of said institutions for a term of not exceeding four (4) years. The board shall have the power and authority to terminate any such contract at any time for malfeasance, inefficiency, or contumacious conduct, but never for political reasons. It shall be the policy of the board to permit the executive head of each institution to nominate for election by the board all subordinate employees of the institution over which he presides. (emphasis added).
Therefore, a valid employment contract exists with the University of Southern Mississippi where the Board of Trustees of State Institutions of Higher Learning approves a nomination of the school's president. Moreover, this is the only way to create such a contract:
In respect to public contracts "where a particular manner of contracting is prescribed, the manner is the measure of power and must be followed to create a valid contract." Donelly on the Law of Public Contracts, 1922 Ed., § 5, p. 7.
American Book Co. v. Vandiver, 181 Miss. 518, 528, 178 So. 598, 600 (1938). See also, Delta Democrat Publishing Co. v. Board of Public Contracts, 224 Miss. 848, 853-54, 81 So.2d 715, 717 (1955), Gordon v. Trustees of Tuscumbia School District, 191 Miss. 203, 207, 1 So.2d 234, 235 (1941).
On several previous occasions, the Court has noted that an enforceable contract must appear in the official minutes of a public board, Mississippi State Highway Commission v. Sanders, 269 So.2d 350, 351-52 (Miss. 1972); Cheatham v. Smith, 229 Miss. 803, 813, 92 So.2d 203, 208 (1957); Thornhill v. Ford, 213 Miss. 49, 61-62, 56 So.2d 23, 28 (1952); Smith County v. Mangum, 127 Miss. 192, 206-07, 89 So. 913, 914 (1921); Bridges & Hill v. Board of Supervisors of Clay County, 58 Miss. 817, 820 (1881), further holding that "each person, firm or corporation," so contracting, "is responsible to see that the contract is legal and properly recorded" on such minutes. Thompson v. Jones County Community Hospital, 352 So.2d 795, 797 (Miss. 1977). See also, Burt v. Calhoun, 231 So.2d 496, 499 (Miss. 1970); Martin v. Newell, 198 Miss. 809, 815, 23 So.2d 796, 797 (1945); Jackson Equipment & Service Co. v. Dunlop, 172 Miss. 752, 766, 160 So. 734, 737 (1935); Pearl Realty Co. v. State Highway Commission, 170 Miss. 103, 113-14, 154 So. 292, 294-95 (1934). Though concerning the Board of Supervisors of Tallahatchie County and not the Board of Trustees of State Institutions of Higher Learning, the rationale for the above rule voiced in Smith v. Board of Supervisors, 124 Miss. *1116 36, 41, 86 So. 707, 709 (1920), is applicable here:
A board of supervisors can act only as a body, and its act must be evidenced by an entry on its minutes. The minutes of the board of supervisors are the sole and exclusive evidence of what the board did. The individuals composing the board cannot act for the county, nor officially in reference to the county's business, except as authorized by law, and the minutes of the board of supervisors must be the repository and the evidence of their official acts.
It is undisputed that the Minutes of the Board of Trustees are silent as to any nomination for or approval of Jerry Bruner. As the only recognized manner by which the University may contract for employment with an applicant, there is no basis for liability so as to defeat the University's directed verdict. We can only remind the appellant of the legal maxim, which states that a person, dealing with an agent, must know at his peril the extent of the agent's authority to bind his principal. Pasco Enterprises, Inc. v. The Southland Insurance Agency, Inc., 408 So.2d 63, 67 (Miss. 1982); Consumers Credit Corp. of Mississippi v. Swilley, 243 Miss. 838, 849, 138 So.2d 885, 889 (1962); Allen v. T.J. Moss Tie Co., 157 Miss. 392, 402, 128 So. 351, 354 (1930); Ismert-Hincke Milling Co. v. Natchez Baking Co., 124 Miss. 205, 213, 86 So. 588, 589 (1920); Busby v. Yazoo & M.V.R. Co., 90 Miss. 13, 16, 43 So. 1, 2 (1907).
As to Lucas and Dale, the trial judge was also correct. In fact, there is no evidence in the record to indicate any grounds on which to submit a question to the jury concerning Lucas' liability.
The same is true for Dale. Indeed, Bruner himself testified that Dale both kept him off the practice field and sent him home to El Paso, awaiting the approval of the Board of Trustees.

II.
Where the grant or denial of a motion for judgment notwithstanding the verdict is on appeal, this Court considers the evidence in the light most favorable to the party against whom the motion has been made, disregarding any evidence on the part of the movant, which is conflicting. If there is credible evidence from which to draw reasonable inferences, supporting the jury's verdict, such verdict must withstand the motion. Bay Springs Forest Products, Inc. v. Wade, 435 So.2d 690, 693 (Miss. 1983). See also, Coca-Cola Bottling Co., Inc. v. Reeves, 486 So.2d 374, 380 (Miss. 1986); Burnham v. Joseph, 482 So.2d 1151, 1153 (Miss. 1986); Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss. 1985); Weems v. American Security Ins. Co., 450 So.2d 431, 435 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Gee v. Hawkins, 402 So.2d 825, 827 (Miss. 1981); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); General Tire & Rubber Co. v. Darnell, 221 So.2d 104, 105 (Miss. 1969). It is possible then to oppose successfully a motion for judgment notwithstanding the verdict even though such verdict is contrary to the overwhelming weight of the evidence. Grimsley v. Tyner, 454 So.2d 482, 484 (Miss. 1984). Yet, this Court will set aside a jury's verdict where it is clear that such verdict is contrary to the overwhelming weight of the credible evidence. Adams v. Green, 474 So.2d 577, 581 (Miss. 1985). See also, Jackson v. Griffin, 390 So.2d 287, 289 (Miss. 1980); Powers v. Malley, 302 So.2d 262, 265 (Miss. 1974); Miss. State Highway Com'n v. Frierson, 240 So.2d 457, 459 (Miss. 1970). In Travelers Indemnity Co. v. Rawson, 222 So.2d 131, 134 (Miss. 1969), we explained our rationale:
This Court is not in a position to evaluate or weigh the truth or falsity of the witnesses who testified for appellant and appellees as is the jury, and we have so held many times. The demeanor or bearing, the tone of voice, the attitude and appearance of the witnesses, all are primarily for inspection and review by the jury. The jury not only has the right and duty to determine the truth or falsity of the witnesses, but also has the right *1117 to evaluate and determine what portions of the testimony of any witness it will accept or reject; therefore, unless it is clear to this Court that the verdict is contrary to the overwhelming weight of the credible testimony, this Court will not set aside the verdict of a jury.
Applying this standard to the case at issue, the jury's verdict was not contrary to the overwhelming weight of credible evidence. In brief, the jury heard Coach Carmody state that he telephoned Bruner, asking him merely to interview for the job, only later agreeing to recommend his employment to the athletic director. He also testified that Bruner's use of an automobile, possession of office keys, and access to game films was consistent with treatment accorded other prospective staff members. Similarly, Dale stated that he himself told Bruner of other candidates for the position. Moreover, both Carmody and Dale denied any knowledge concerning Bruner's insurance application for the automobile. This is sufficient to support the finding of the jury, thereby defeating the motion for judgment notwithstanding the verdict in the lower court as well as the assignment of error, here.
Consistent with the above and finding no other error, we affirm.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
ANDERSON, J., not participating.